1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF FLORIDA
2
            19-2735-MJ-BECERRA
3

4
UNITED STATES OF AMERICA,        )
5                                )
              PLAINTIFF,         )
6                                )
          VS.                    )
7                                )
RICHARD LAURENCE KADISH,         )
8                                )
              DEFENDANT.         )
9    _____)

10          (TRANSCRIPT BY DIGITAL RECORDING)

11

12          TRANSCRIPT OF REMOVAL AND PRETRIAL DETENTION HEARING

13   HAD BEFORE THE HONORABLE EDWIN G. TORRES, IN MIAMI, MIAMI-DADE

14   COUNTY, FLORIDA, ON MAY 10, 2019, IN THE ABOVE-STYLED MATTER.

15

16
     APPEARANCES:
17
     FOR THE GOVERNMENT:   CHRISTOPHER FENTON, A.U.S.A.
18                         99 NE 4TH STREET
                           MIAMI, FL 33132 - 305 961-9000
19
     FOR THE DEFENDANT:    SOWMYA BHARATHI, A.F.P.D.
20                         150 WEST FLAGLER STREET, SUITE 1500
                           MIAMI, FL 33130 - 305 536-6900
21

22

23              CARL SCHANZLEH, RPR - CM
                CERTIFIED COURT REPORTER
24                9960 SW 4TH STREET
                PLANTATION, FLORIDA 33324
25                  954 424-6723

2

```
 1
 2                         TABLE OF CONTENTS
 3    WITNESSES:                    DIRECT  CROSS REDIRECT RECROSS
 4    JAN BODON ............................... 11
 5                         INDEX TO EXHIBITS
 6    EXHIBITS                     MARKED FOR        RECEIVED
                                   IDENTIFICATION    IN EVIDENCE
 7
      DESCRIPTION              PAGE     LINE     PAGE     LINE
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1  (MIAMI, MIAMI-DADE COUNTY, FLORIDA;  MAY 10, 2019, IN OPEN

2  COURT.)

3  THE CLERK:  CALLING THE CASE OF UNITED STATES VERSUS

4  RICHARD LAWRENCE KADISH, CASE NUMBER 19-2735-MJ-BECERRA.

5  MS. BHARATHI:  GOOD MORNING, YOUR HONOR.  SOWMYA

6  BHARATHI FROM THE FEDERAL PUBLIC DEFENDER'S OFFICE ON BEHALF OF

7  MR. KADISH WHO IS APPROACHING.

8  MR. FENTON:  AND GOOD MORNING, YOUR HONOR.

9  CHRISTOPHER FENTON FOR THE UNITED STATES.

10  THE COURT:  GOOD MORNING, EVERYBODY.  MR. KADISH.

11  WE WERE SET FOR OUR STATUS ON REMOVAL AND DETENTION

12  HEARING?

13  MS. BHARATHI:  YES, YOUR HONOR.

14  IF WE COULD GO FORWARD ON BOTH OF THOSE MATTERS.

15  THE COURT:  OKAY.  VERY GOOD.

16  GO AHEAD.

17  MR. FENTON:  OKAY, YOUR HONOR.

18  I GUESS WE'LL START WITH DETENTION.

19  THE COURT:  SURE.

20  MR. FENTON:  WITH THE COURT'S PERMISSION THE

21  GOVERNMENT WILL PROCEED BY PROFFER AND WE ALSO HAVE U.S. POSTAL

22  INSPECTOR JAN BODON HERE AND AVAILABLE TO ANSWER ANY QUESTIONS.

23  I ALSO WANTED TO POINT OUT THAT THIS MORNING WE

24  SUBMITTED A SHORT BRIEF ARGUING FOR DETENTION WHICH ALSO

25  ATTACHES SIX EXHIBITS THAT I WILL ADDRESS WHEN I'M DOING THE

1  FACTUAL PROFFER.

2         THE DEFENDANT WAS CHARGED ON MARCH 5TH, 2019 IN A 21
3  COUNT INDICTMENT.  ONE COUNT OF CONSPIRACY TO COMMIT MAIL AND
4  WIRE FRAUD, 10 COUNTS OF MAIL FRAUD AND 10 COUNTS OF WIRE
5  FRAUD.  HE WAS CHARGED ALONG WITH FIVE OTHER DEFENDANTS, ALL OF
6  WHOM HAVE BEEN ARRESTED WITH THE EXCEPTION OF ONE WHO IS A
7  FUGITIVE IN MEXICO.

8         IN SUMMARY, THE INDICTMENT ALLEGES THAT FOR FIVE YEARS
9  THE DEFENDANTS WERE INVOLVED IN A HIGH YIELD INVESTMENT FRAUD
10 SCHEME SELLING UNREGISTERED STOCK IN A COMPANY CALLED EARTH
11 WATER BY TELEMARKETING AND E-MAIL MARKETING AMONG OTHER MEANS.

12        THREE OF THE DEFENDANTS WERE PURPORTEDLY EXECUTIVES AT
13 EARTH WATER, THE OTHER THREE DEFENDANTS WERE INDEPENDENT
14 SALESPEOPLE WHO WERE PROMOTING AND SELLING THE STOCK TO
15 VICTIMS.

16        MR. KADISH WAS ONE OF THE INDEPENDENT SALESPEOPLE AND
17 HE DID ALL OF HIS EARTH WATER RELATED BUSINESS AS TWO -- UNDER
18 TWO DIFFERENT CORPORATE NAMES, ONE IS ENERGY FARMS, INC., AND
19 THE SECOND IS NATION IRPR, INC.

20        THE EVIDENCE WILL SHOW THAT MR. KADISH PARTICIPATED IN
21 DRAFTING PROMOTIONAL MATERIALS AND INVESTOR PRESENTATIONS, SOME
22 OF WHICH WERE STAMPED WITH THE NAME OF MR. KADISH'S COMPANY,
23 NATIONAL IRPR.  THESE DOCUMENTS CONTAINED NUMEROUS FALSE AND
24 MISLEADING STATEMENTS INCLUDING MOST IMPORTANTLY FOR
25 MR. KADISH'S PURPOSES THAT AROUND 90 PERCENT OF THE MONEY THAT

1   WAS BEING RAISED WOULD BE REINVESTED IN EARTH WATER, IN THE

2   COMPANY, TO EXPAND ITS OPERATIONS AND GROW THE BUSINESS AND

3   THEN --

4           THE COURT:  WAS HE AN OWNER OF THE -- OF THE BUSINESS

5   YOU'RE TALKING ABOUT OR WAS HE ONE OF THE SALES --

6           MR. FENTON:  MR. KADISH WAS ONE OF THE SALESPEOPLE.

7           THE COURT:  GOT IT.

8           MR. FENTON:  SO HE WAS THE OWNER OF NATIONAL IRPR.

9   THAT WAS THE COMPANY THAT WAS HIS DBA --

10          THE COURT:  OKAY.

11          MR. FENTON:  -- THAT HE DID BUSINESS AS.

12          BUT HE DID PREPARE PROMOTIONAL MATERIALS, HE DID

13  PREPARE INVESTOR PRESENTATIONS.  HE EDITED THEM, HE DRAFTED

14  THEM, HE CIRCULATED THEM TO INVESTORS AND ALSO TO THE

15  SALESPEOPLE AND THEY REPRESENTED THAT 90 PERCENT OF THE MONEY

16  THAT WAS BEING RAISED WAS GOING TO BE REINVESTED IN THE COMPANY

17  AND AT MOST 10 PERCENT WOULD BE PAID IN SALES COMMISSIONS TO

18  MR. KADISH AND PEOPLE LIKE MR. KADISH.

19          IN REALITY THE EVIDENCE WILL SHOW THAT MR. KADISH WAS

20  SKIMMING THE MONEY WITH THE EARTH WATER EXECUTIVES, 50/50.  SO

21  FOR FIVE YEARS THE EVIDENCE WILL SHOW THAT HE SUBMITTED

22  INVOICES TO THE EARTH WATER EXECUTIVES.  THE EARTH WATER

23  EXECUTIVES WERE EXPECTED TO PAY 50 PERCENT OF EACH VICTIM'S

24  FUNDS SO EVERY INVESTOR THAT HE GOT MONEY FROM HE GOT HALF OF

25  THEIR MONEY AND HE WAS IN FACT PAID THAT MONEY.

1          BASED ON THE INVESTIGATION TO DATE TOTAL LOSSES FROM

2  THE CONSPIRACY ARE EXPECTED TO BE AT LEAST 10 MILLION DOLLARS

3  AND THE TOTAL NUMBER OF VICTIMS IS EXPECTED TO BE AT LEAST 250.

4          THE DEFENDANTS INCLUDING MR. KADISH ARE ALLEGED TO

5  HAVE TARGETED THE ELDERLY AS WELL AS OTHER VULNERABLE MEMBERS

6  OF SOCIETY.  IN TOTAL TO DATE IT APPEARS THAT EARTH WATER PAID

7  MR. KADISH ALMOST 2.5 MILLION DOLLARS WITH THE MONEY BEING

8  FUNNELED THROUGH BANK ACCOUNTS UNDER THE NAMES OF ENERGY FARMS

9  AND NATIONAL IRPR.

10          NOW, WHILE THE MAXIMUM PENALTIES FOR THE CHARGED

11  OFFENSES ARE 20 YEARS IMPRISONMENT FOR EACH COUNT, UNDER 18 USC

12  2326 MR. KADISH IS ALSO SUBJECT TO ENHANCED PENALTY OF UP TO AN

13  ADDITIONAL 10 YEARS OF IMPRISONMENT FOR A TOTAL MAX OF 30

14  YEARS.

15          WITH RESPECT TO FACTUAL PROFFER REGARDING DETENTION.

16  AT THE TIME --

17          THE COURT:  GIVEN HIS HISTORY, THOUGH, WHAT ARE THE

18  CURRENT SENTENCING GUIDELINES THAT HE WOULD FACE IF CONVICTED?

19          MR. FENTON:  WELL, HIS SENTENCING GUIDELINES -- THE

20  OFFENSE LEVEL IS APPROXIMATELY -- IT'S AROUND EIGHT THIRTY.  SO

21  36, 37.  IN TERMS OF THE NUMBER, THE NUMBERS ARE VERY HIGH.  SO

22  WE ARE LOOKING AT ANYWHERE FROM 188 TO 235 MONTHS IF IT IS IN

23  THE LOW END OF THE RANGE OR THE LOW TWO HUNDREDS TO THE MID TWO

24  HUNDREDS IF IT IS 37.  SO THE SENTENCE COULD BE QUITE

25  SIGNIFICANT.

1    AT THE TIME THAT MR. KADISH WAS INDICTED HE WAS IN THE

2  MIDDLE OF GETTING A NEW LIFE WITH A NEW FAMILY IN A NEW

3  COUNTRY.  FROM AT LEAST 2014 TO THE PRESENT MR. KADISH

4  FREQUENTLY TRAVELED TO BRAZIL STAYING ANYWHERE FROM SEVERAL

5  WEEKS TO SEVERAL MONTHS.  AT THE TIME OF HIS ARREST AFTER BEING

6  MIRANDIZED MR. KADISH TOLD U.S. POSTAL INSPECTOR BODON THAT HE

7  HAS A FIANCEE IN BRAZIL AND THAT HIS FIANCEE IS PREGNANT.

8    HE TOLD INSPECTOR BODON THAT HE RECENTLY SOLD HIS

9  RESIDENCE IN MIAMI AND THAT HE AND HIS PREGNANT FIANCEE PLAN TO

10  SPLIT THEIR TIME BETWEEN THE UNITED STATES AND BRAZIL.

11    NOW THE FACT THAT MR. KADISH WAS PLANNING TO MOVE FROM

12  THE UNITED STATES TO BRAZIL BEFORE HE LEARNED OF THIS

13  INDICTMENT IS ALONE AND SUFFICIENT TO FIND IN THE GOVERNMENT'S

14  VIEW HE IS A SERIOUS RISK OF FLIGHT.  THE FACT THAT HE'S NOW

15  FACING 30 YEARS IMPRISONMENT MAKES THAT RISK IN THE

16  GOVERNMENT'S VIEW QUITE OVERWHELMING.

17    WHEN INTERVIEWED, HOWEVER, BY PRETRIAL SERVICES HE

18  PRESENTED A VERY DIFFERENT PICTURE THAT DOWNPLAYED THE RISK OF

19  FLIGHT.  HE TOLD PRETRIAL SERVICES THAT HE HAD A GIRLFRIEND,

20  NOT A FIANCEE.  HE TOLD PRETRIAL SERVICES THAT HE AND HIS

21  GIRLFRIEND DID NOT CURRENTLY HAVE A CHILD BUT OMITTED TO

22  MENTION THAT THEY WERE EXPECTING TO HAVE ONE SOON AND THESE

23  FACTS PLAINLY CONTRADICT WHAT HE TOLD INSPECTOR BODON AND

24  SUGGEST THAT HE WAS TRYING TO CONCEAL THE STRENGTH OF HIS TIES

25  TO BRAZIL.

1    ANOTHER FACTOR THAT IS IMPORTANT IS HIS EMPLOYMENT.
2    MR. KADISH TOLD PRETRIAL SERVICES THAT HIS ONLY JOB FOR 25
3    YEARS IS SELLING SECURITIES, RAISING CAPITAL FOR COMPANIES.
4    MR. KADISH, HOWEVER, IS NOT QUALIFIED TO SELL SECURITIES.  HE
5    DOES NOT HAVE A COLLEGE DEGREE, HE DOES NOT HAVE ANY
6    PROFESSIONAL LICENSES AND HE ALMOST DEFINITELY DID NOT OBTAIN
7    AT A LEGITIMATE BROKER DEALER BECAUSE HE HAS A HISTORY OF
8    SUBSTANCE ABUSE AND ALCOHOL ABUSE AND HE ALSO HAS A PRIOR
9    CONVICTION FOR GRAND THEFT.

10    AT THE TIME OF HIS ARREST AFTER BEING MIRANDIZED HE
11    TOLD INSPECTOR BODON THAT HE WAS SELF EMPLOYMENT AND THAT THE
12    NAME OF HIS COMPANY WAS NATIONAL IRPR.

13    AS EXPLAINED BEFORE, NATIONAL IRPR IS AT THE HEART OF
14    THE HIGH YIELD INVESTMENT FRAUD THAT IS CHARGED IN THE
15    INDICTMENT.  AND BASED ON THE INVESTIGATION TO DATE
16    APPROXIMATELY 99 PERCENT OF THE MONEY THAT IS NATIONAL IRPR'S
17    BANK ACCOUNT COMES FROM THE EARTH WATER FRAUD.  SO MERELY ALL
18    OF THE MONEY THAT'S GONE INTO THAT ACCOUNT.  MR. KADISH,
19    THEREFORE, DOESN'T HAVE ANY LEGITIMATE SOURCE OF INCOME THAT
20    WOULD SERVE AS A TIE TO THE UNITED STATES OR ANY JOB THAT HE
21    WOULD BE RELINQUISHING, ANY LEGITIMATE GAINFUL EMPLOYMENT THAT
22    HE WOULD BE RELINQUISHING IF HE WERE TO BE DETAINED PRETRIAL.

23    FINALLY MR. KADISH TOLD PREVAIL SERVICES THAT IF HE
24    WAS RELEASED ON BOND HE WOULD RESIDE WITH HIS MOTHER LENORE,
25    AND LENORE CONFIRMED THAT SHE WOULD BE AGREEABLE TO THAT

1   ARRANGEMENT.

2        LENORE, HOWEVER, CANNOT BE REASONABLY RELIED UPON TO

3   PREVENT MR. KADISH WAS FLEEING BECAUSE -- THIS IS IMPORTANT --

4   WHETHER KNOWINGLY OR UNKNOWINGLY SHE IS INVOLVED IN THE

5   FRAUDULENT SCHEME CHARGED IN THE INDICTMENT.

6        BASED ON BANK RECORDS THAT THE GOVERNMENT SUBPOENAED

7   FROM WELLS FARGO LENORE IS LISTED IN THE ACCOUNT OPENING

8   DOCUMENTS FOR NATIONAL IRPR AS ONE OF TWO, QUOTE, OWNERS WITH

9   CONTROL OVER THE ENTITY, THE OTHER OWNER BEING MR. KADISH.  SHE

10   IS ALSO LISTED AS ONE OF TWO SIGNERS ON NATIONAL IRPR'S BANK

11   ACCOUNT, AGAIN THE OTHER BEING MR. KADISH.

12        LENORE SIGNED THE ACCOUNT OPENING DOCUMENTS FOR

13   NATIONAL IRPR.  SO THERE IS NO QUESTION THAT SHE SAW THOSE

14   DOCUMENTS, SHE ACTUALLY SIGNED THEM AND SHE SIGNED THEM IN

15   MULTIPLE PLACES.

16        LENORE ALSO SIGNED CHECKS DISTRIBUTING THE PROCEEDS OF

17   THE FRAUD TO MR. KADISH'S CO-CONSPIRATORS.  SO SHE SIGNED

18   CHECKS SKIMMING COMMISSIONS WITH THE PEOPLE WHO WERE SELLING

19   STOCK -- EARTH WATER STOCK ALONG WITH MR. KADISH.  LENORE ALSO

20   RECEIVED AND PERSONALLY BENEFITED FROM THE PROCEEDS OF THE

21   FRAUD RECEIVING CHECKS WRITTEN OUT TO ENERGY FARMS -- WRITTEN

22   OUT OF THE ENERGY FARMS AND THE NATIONAL IRPR ACCOUNTS.  AND IN

23   SOME INSTANCES LENORE ACTUALLY WROTE THE CHECK AND SIGNED THE

24   CHECK TO HERSELF.

25        WHETHER KNOWINGLY OR UNKNOWINGLY MR. KADISH --

1          THE COURT:  WHAT WAS THE PERIOD OF THE FRAUD.

2          MR. FENTON:  THE PERIOD OF THE FRAUD WAS 2013 TO TWO

3  THOUSAND -- WELL, TO THE PRESENT UNTIL HE WAS ARRESTED.

4          THE COURT:  OKAY.

5          MR. FENTON:  AT THE TIME HE WAS ARRESTED HE SAID HIS

6  CURRENT EMPLOYER WAS NATIONAL IRPR.

7          BASED ON THE BANK RECORDS -- I'M SORRY, YOUR HONOR.

8  WHETHER KNOWINGLY OR UNKNOWINGLY MR. KADISH'S SISTER MELISSA

9  JOHNSON WAS ALSO INVOLVED IN THE FRAUD THAT WAS CHARGED IN THE

10  INDICTMENT.  AGAIN BASED ON BANK RECORDS SUBPOENAED FROM WELLS

11  FARGO, ISS JOHNSON WAS A CO-SIGNER ON THE ENERGY FARMS ACCOUNT

12  WITH MR. KADISH.  LIKE LENORE, MISS JOHNSON SIGNED THE ACCOUNT

13  OPENING STATEMENTS, AND LIKE LENORE MISS JOHNSON SIGNED CHECKS

14  DISTRIBUTING THE PROCEEDS OF THE FRAUD TO MR. KADISH'S

15  CO-CONSPIRATORS.

16          MISS JOHNSON ALSO RECEIVED AND PERSONALLY BENEFITED

17  FROM THE PROCEEDS OF THE FRAUD RECEIVING CHECKS WRITTEN OUT OF

18  THE ENERGY FARMS AND THE NATIONAL IRPR ACCOUNTS, AND IN SOME

19  INSTANCES AGAIN MISS JOHNSON WROTE AND SIGNED THE CHECKS TO

20  HERSELF.  SO BASED ON THESE FACTS, THE FACT THAT MR. KADISH HAS

21  SOLD HIS HOME IN MIAMI, HE HAS A PREGNANT FIANCEE --

22          THE COURT:  WHEN DID HE SELL HIS HOME?

23          MR. FENTON:  WE DON'T KNOW THE DATE OF THE SALE BUT WE

24  WERE TOLD THAT HE -- BUT HE TOLD INSPECTOR BODON AT THE TIME

25  THAT HE WAS ARRESTED THAT HE HAD RECENTLY SOLD HIS HOME IN

1  MIAMI.

2         ONE FINAL FACT THAT I THINK IS WORTH MENTIONING IS

3  THAT WHILE WORD AS MR. KADISH RECENTLY RETURNED TO BRAZIL TWO

4  DAYS AGO -- FROM BRAZIL TWO DAYS AGO TO MIAMI HIS INTENTION

5  CLEARLY WAS NOT TO STAY FOR VERY LONG.  MR. KADISH HAS A RETURN

6  TICKET TO BRAZIL FOR SUNDAY, MAY 13 FOR MOTHER'S DAY.  SO HIS

7  PLAN IS TO GO BACK TO BRAZIL AS SOON AS POSSIBLE PRESUMABLY TO

8  BE WITH HIS PREGNANT FIANCEE.

9         THE COURT:  OKAY.  MISS BHARATHI?

10        MS. BHARATHI:  YES, YOUR HONOR.  IF I COULD QUESTION

11 THE -- I THINK IT'S THE INSPECTOR?

12        THE COURT:  OKAY.

13        CALL THE INSPECTOR.

14        THE CLERK:  REMAIN STANDING (INAUDIBLE)

15        (WITNESS SWORN)

16        THE WITNESS:  I DO.

17        THE CLERK:  PLEASE HAVE A SEAT, SIR, AND STATE AND

18 SPELL YOUR NAME FOR THE RECORD.

19        THE WITNESS:  MY NAME IS JAN, J-A-N, BODON, B-O-D-O-N.

20                    JAN BODON,

21 BEING DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

22                 CROSS EXAMINATION

23 BY MS. BHARATHI:

24 Q.  GOOD MORNING, INSPECTOR.  HOW ARE YOU?

25 A.  GOOD MORNING.  I'M DOING WELL.

1  Q.  DID YOU HAVE AN OPPORTUNITY TO LISTEN TO THE PROFFER BY THE

2  PROSECUTOR?

3  A.  YES, MA'AM.

4  Q.  ARE THERE ANY CORRECTIONS OR CHANGES THAT YOU WOULD MAKE TO

5  THAT PROFFER BEFORE ADOPTING THAT STATEMENT AS YOUR OWN?

6  A.  NO, MA'AM.

7  Q.  SO YOU WOULD ADOPT THAT STATEMENT AS YOUR OWN?

8  A.  YES, MA'AM.

9  Q.  OKAY.  I'M GOING TO START A LITTLE BIT BACKWARDS.  I THINK

10 THE LAST THING THAT THE PROSECUTOR -- WELL, ONE OF THE LAST

11 THINGS THAT HE SAID WAS IN REGARDS TO A HOME THAT MR. KADISH

12 ALLEGEDLY OWNED AND THEN SUBSEQUENTLY SOLD IN SOUTH FLORIDA.

13 DID YOU HEAR THAT?

14 A.  YES, MA'AM.

15 Q.  OKAY.  AND WHERE IS THE ADDRESS OR WHAT IS THIS HOME?

16 A.  I DON'T KNOW -- I CAN'T REMEMBER THE EXACT ADDRESS.  IT WAS

17 AN APARTMENT I THINK IT WAS MENTIONED IN MIDTOWN MIAMI.  I

18 THINK THE UNIT NUMBER WAS 1213.  I'M NOT SURE OF THE ACTUAL

19 STREET ADDRESS, BUT WHILE WE WERE WAITING FOR THE U.S. MARSHALS

20 TO OPEN AT 8:30 HE MENTIONED THAT HAD RECENTLY SOLD THIS PLACE

21 AND HE WAS LIVING WITH HIS MOTHER.

22 Q.  OKAY.  AND SO JUST TO BE CLEAR.  THIS WAS A STATEMENT THAT

23 WAS MADE WHILE HE WAS PENDING -- PROCESSING WITH THE MARSHALS?

24 A.  YES.  WE WERE JUST WAITING FOR THE MARSHALS TO ALLOW US TO

25 GO INSIDE.

1 Q.  OKAY.  AND SO BETWEEN -- AND THAT WAS PRESUMABLY TWO DAYS

2 AGO, THE DAY HE WAS ARRESTED, IS THAT CORRECT?

3 A.  YES, MA'AM.

4 Q.  SO BETWEEN NOW AND TODAY WHAT EVIDENCE DO YOU HAVE THAT HE

5 ACTUALLY OWNED THIS APARTMENT?

6 A.  WELL, WE DID SOME DATABASE SEARCHES TO TRY AND LOCATE

7 MR. KADISH AND THE ADDRESS CAME BACK IN HIS NAME.  I WENT AHEAD

8 AND CONTACTED THE LOCAL POST OFFICE.  I SPOKE TO THE CARRIER

9 THAT DELIVERS THAT ROUTE -- THAT'S AS SIGNED TO THAT ROUTE.

10 THEY SAID THAT THEY WOULD CHECK -- THEY WENT TO THE LOCATION.

11      THEY WERE ABLE TO TALK TO THE LEASING OFFICE AND THEY

12 EXPLAINED THAT HE NO LONGER LIVED THERE, THAT HE WASN'T THE

13 RESIDENT AT THAT APARTMENT ANY LONGER.

14 Q.  OKAY.  SO JUST TO CLARIFY.  THIS WAS AN APARTMENT THAT HE

15 RENTED, THAT'S WHY THE LEASING OFFICE HAD INFORMATION THAT HE

16 WAS NO LONGER LEASING THE APARTMENT, CORRECT?

17 A.  I'M NOT SURE IF HE BOUGHT IT AND IT WAS BEING SUBLET OR IF

18 HE WAS RENTING IT.  I SAY LEASING OFFICE, THAT'S A COMMON TERM

19 THAT I WOULD USE.  BUT IT WAS THE PEOPLE THAT KNOW WHO THE

20 RESIDENCE ON THE PROPERTY.

21 Q.  OKAY.  SO THEY (UNINTELLIGIBLE) OWNS THE PLACE, THAT'S WHY

22 THE (UNINTELLIGIBLE) DEEDED THAT'S SOMETHING THAT WOULD COME UP

23 ON STANDARD LAW ENFORCEMENT CHECKS, CORRECT?

24 A.  WELL, WHEN I SAY THAT HE SOLD IT, I'M RELYING ON WHAT HE

25 SAID.  AND, YOU KNOW, THE DATABASE RESULTS SHOW THAT HE WAS

```
 1   RESIDING THERE.  WHEN I SPOKE TO THE CARRIER, THE CARRIER SAID
 2   THAT THEY HAD DELIVERED MAIL THERE IN THAT NAME, RICHARD
 3   KADISH, BUT THAT HE WAS NO LONGER RESIDING AT THAT APARTMENT.
 4   Q.  OKAY.  WITH RESPECT TO THE STATEMENT REGARDING THE PREGNANT
 5   FIANCEE.  WAS THIS STATEMENT MADE AT APPROXIMATELY THE SAME
 6   TIME?
 7   A.  NO.  THAT STATEMENT WAS MADE WHEN WE WERE AT THE AIRPORT
 8   INSIDE THE CBP OFFICES.
 9   Q.  AND WAS THAT STATEMENT RECORDED IN ANY WAY?
10   A.  I BELIEVE THAT IT WAS, YES.
11   Q.  AUDIO, VIDEO, BOTH?
12   A.  AUDIO I BELIEVE.
13   Q.  OKAY.  AND WERE YOU GIVEN CONTACT INFORMATION FOR THIS THE
14   FIANCEE?  WERE YOU ABLE TO REACH HER?
15   A.  NO.
16   Q.  LAW ENFORCEMENT SEIZED HIS CELLPHONE, IS THAT CORRECT?
17   A.  YES.
18   Q.  AND HAS THAT BEEN SEARCHED?
19   A.  NOT YET.
20   Q.  AND REGARDING -- NOW I'M GOING TO BACK UP A LITTLE BIT.
21        WHAT WAS YOUR ROLE IN TERMS OF ARRESTING MR. KADISH?
22   WERE YOU PRESENT WHEN HE WAS ARRESTED?
23   A.  YES, MA'AM.
24   Q.  OKAY.  AND WERE YOU THE ONE WHO MIRANDIZED HIM?
25   A.  YES, MA'AM.
```

1   Q.   ALL RIGHT.  AND SO CAN YOU TELL US -- THE PROSECUTOR MADE

2   REFERENCE TO STATEMENTS THAT MR. KADISH MADE AFTER HE WAS

3   ARRESTED.  COULD YOU LET THE COURT KNOW WHAT STATEMENTS HE

4   MADE?

5   A.   WHAT STATEMENTS IN REGARDS TO ALL OF THE STATEMENTS THAT HE

6   MACE.

7   Q.   IN REGARD TO THE INDICTMENT THAT WE'RE HERE ON.

8   A.   WELL, WHEN HE WAS ARRESTED HE WAS CONCERNED ABOUT WHAT HE

9   WAS BEING ARRESTED FOR.  HE ASKED A FEW TIMES WHY HE WAS BEING

10  ARRESTED FOR AFTER I READ HIM HIS RIGHTS.  I EXPLAINED HE WAS

11  ARRESTED FOR FRAUD.

12        AT THAT POINT HE ASKED FRAUD FOR WHAT?  AND I SAID,

13  WELL, IT'S JUST FRAUD.  WOULD YOU LIKE TO SPEAK TO ME?  AND HE

14  SAID THAT HE DID NOT BECAUSE HE DIDN'T KNOW WHAT THE FRAUD WAS

15  ABOUT.  HE SAID HE WOULD LIKE TO SPEAK TO HIS ATTORNEY.

16        AT THAT POINT WE JUST WAITED IN THE CBP OFFICES UNTIL

17  HIS BAGS WERE BROUGHT UP BECAUSE HE CHECKED ONE BAG AND HE HAD

18  A BACKPACK WITH HIM THAT WAS A CARRY ON.

19  Q.   OKAY.  SO OTHER THAN WHAT YOU JUST RELIED OR WHAT HE JUST

20  SAID PLUS THE STATEMENTS AT THE MARSHAL LOCKUP THAT YOU TOLD US

21  ABOUT TODAY, THOSE ARE THE ENTIRETY OF THE STATEMENTS THAT HE

22  MADE?

23  A.   HE MADE OTHER COMMENTS WHILE WE WERE WAITING DOWNSTAIRS.

24  HE TOLD US -- OR HE TOLD ME ABOUT THE -- WHY HE WAS ON

25  CRUTCHES.  THAT HE HAD SUSTAINED AN INJURY, A FRACTURE TO ONE

1    OF HIS LEGS.  HE TOLD ME -- WE WERE CHITCHATTING.  IT'S HARD TO

2    RECALL EXACTLY, YOU KNOW, ALL OF THE OTHER THINGS.  BUT THE

3    STATEMENTS THAT HE MADE IN RELATION TO HAVING TIES TO BRAZIL --

4    STRONGER TIES TO BRAZIL STUCK OUT BECAUSE I HAD TO GO THROUGH

5    THE TROUBLE TO LOCATE HIM THROUGH, YOU KNOW, THE AIRPORT AND

6    ALL THAT KIND OF STUFF.

7    Q.  OKAY.  SO THE CHITCHATTING DIDN'T REALLY RELATE TO THE CASE

8    IS WHAT I'M TRYING TO CONFIRM.

9    A.  OTHER THAN --

10   Q.  OTHER THAN --

11          (BOTH TALKING AT THE SAME TIME)

12   A.  -- POINTING OUT TO MR. FENTON, NO.

13   Q.  OKAY.  AND MR. KADISH WAS TRAVELING UNDER HIS TRUE NAME,

14   CORRECT?

15   A.  YES.

16   Q.  OKAY.  AND I HAVE A FEW QUESTIONS REGARDING SOME STATEMENTS

17   THAT WERE MADE BOTH IN THE PROFFER AND IN THE INDICTMENT.  YOU

18   HAVE HAD AN OPPORTUNITY TO PREVIOUSLY REVIEW THE INDICTMENT,

19   CORRECT?

20   A.  IT'S BEEN A WHILE, BUT, YES.

21   Q.  OKAY.  AND (UNINTELLIGIBLE) THE QUESTION AND YOU DON'T

22   RECALL WHAT WAS IN THE INDICTMENT I CAN CERTAINLY PASS MY COPY

23   TO YOU.  OKAY?

24          SO THE PROSECUTOR MENTIONED THAT THERE WERE IN TOTAL

25   SIX INDIVIDUALS CHARGED, MR. KADISH BEING THE FOURTH.  DO YOU

1  RECALL THAT?

2  A.  YES.

3  Q.  OKAY.  ONE OF THE INDIVIDUALS I BELIEVE THE PROSECUTOR

4  STATED WAS A FUGITIVE IN MEXICO, CORRECT?

5  A.  YES.

6  Q.  OKAY.  WHEREAS MR. KADISH AND THE REMAINING DEFENDANTS HAVE

7  BEEN ARRESTED, CORRECT?

8  A.  YES.

9  Q.  MR. GREEN MADE THE INITIAL APPEAR -- WHICH IS A

10  CODEFENDANT, HE MADE AN APPEARANCE IN FORT LAUDERDALE AND THE

11  GOVERNMENT RECOMMENDED A PERSONAL SURETY BOND, IS THAT CORRECT?

12  A.  YES.

13  Q.  DO YOU KNOW WHAT THE BONDS THAT WERE RECOMMENDED FOR THE --

14  MR. COMU AND MR. PRICE AND MR. BARNS?  THOSE ARE THE THREE

15  OWNERS.

16  A.  IN MR. COMU'S CASE WE ALSO -- WE'VE GOT A DETENTION HEARING

17  PENDING --

18  Q.  OKAY.

19  A.  -- IN THE NORTHERN DISTRICT OF TEXAS AND I DO NOT KNOW WHAT

20  THE CONDITIONS OF RELEASE WERE FOR MR. PRICE OR MR. BARNS.

21  Q.  BUT THEY WERE BOTH RELEASED ON BOND.

22  A.  I KNOW THAT THEY WERE RELEASED.  I DON'T KNOW IF IT WAS A

23  P.R. BOND OR IF IT WAS A SURETY BOND.

24  Q.  SURE.  BUT YOU DON'T KNOW THE CONDITIONS BUT THEY BONDED

25  OUT.

1                AND DO YOU KNOW -- IF YOU KNOW, DO YOU KNOW IF THE

2 GOVERNMENT RECOMMENDED BONDS FOR THOSE OWNERS OTHER THAN

3 MR. COMU?

4 A. I DON'T KNOW WHAT THE GOVERNMENT RECOMMENDED. IT DOESN'T

5 SURPRISE ME THAT THEY WERE RELEASED ON BOND BECAUSE BASED ON

6 THE INVESTIGATION I HAD DONE THEY WERE -- MR. PRICE -- THERE

7 WASN'T AN INHERENT FLIGHT OR RISK FOR MR. BONDS. HE DOESN'T

8 HAVE A PASSPORT. AND SO THAT'S -- THAT'S WHY THAT WENT THAT

9 WAY.

10 Q. OKAY. AND THAT LEADS ME TO MY NEXT QUESTION. WHEN

11 MR. KADISH WAS ARRESTED LAW ENFORCEMENT SEIZED HIS PASSPORTS,

12 CORRECT?

13 A. YES.

14 Q. AND HE HAD TWO PASSPORTS IN HIS TRUE NAME, CORRECT?

15 A. YES.

16 Q. OKAY. AND HE HAD EXPLAINED THAT HE ACTUALLY HAD TWO

17 PASSPORTS IN HIS TRUE NAME BECAUSE HE HAD -- OR DID HE EXPLAIN

18 THAT HE HAD THOUGHT THAT HE HAD LOST HIS FIRST PASSPORT AND

19 APPLIED FOR A SECOND?

20 A. I DON'T REMEMBER WHY HE HAD TWO PASSPORTS. I DO REMEMBER

21 THE CBP MENTIONED THAT HE HAD TWO AND THEY PROVIDED A REASON

22 BUT I DON'T RECALL WHAT THE REASON WAS.

23 Q. THAT'S FINE.

24 A. I KNOW --

25 Q. THAT'S --

1  A.  -- THAT ONE OF THEM HAD LIKE LITTLE HOLES PUNCHED IN IT.

2  Q.  RIGHT.  RIGHT.  OKAY.  AND THEN REGARDING -- IN THE

3  INDICTMENT THERE IS MENTION ON PAGE FIVE THAT MR. KADISH USED

4  AN EMAIL ACCOUNT, HYDRO@CAPITAL360.DOM AND RICH@CAPITAL360.COM

5  TO, QUOTE, UNQUOTE, MASK HIS TRUE IDENTITY AND HIS BACKGROUND

6  FROM THE INVESTORS.

7       HAVE YOU HAD AN OPPORTUNITY TO LOOK AT ANY OF THE

8  EMAILS OR DOCUMENTS IN THIS CASE THAT CAME FROM THAT --

9  THOSE -- EITHER OF THOSE EMAIL ADDRESSES?

10  A.  I HAVE BUT IT WAS AWHILE AGO.

11  Q.  OKAY.  DO YOU RECALL MR. KADISH SIGNING HIS NAME ON --

12  SIGNING OFF ON EMAILS OR DOCUMENTS TO INVESTORS?

13  A.  I BELIEVE SO, YES.

14  Q.  AND HE WOULD SIGN RICHARD OR RICHY?

15  A.  I BELIEVE SO.

16  Q.  OKAY.  SO THE EMAIL ACCOUNT MAY HAVE SAID HYRDRO, OR

17  CAPITAL, OR RICH CAPITAL BUT THE INVESTORS HAD THE NAME RICHARD

18  OR RICHY KADISH, CORRECT?

19  A.  I BELIEVE SO.

20  Q.  OKAY.  THE GOVERNMENT MENTIONED IN THE INDICTMENT THAT

21  MR. KADISH IS ALLEGED TO HAVE RECRUITED ONE OR MORE

22  INDIVIDUALS.  DO YOU KNOW ANY IDENTITY HERE TODAY WHO IT IS

23  THAT HE IS ALLEGED TO HAVE RECRUITED OR HOW MANY APPROXIMATELY

24  HE DID (UNINTELLIGIBLE)

25  A.  WE ARE STILL WORKING ON IDENTIFYING THE TOTAL NUMBER OF

1  INDIVIDUALS.

2  Q.  OKAY.  BUT JUST APPROXIMATELY -- IT SAYS THAT KADISH

3  RECRUITED ONE OR MORE INDIVIDUALS.  DO YOU HAVE AN APPROXIMATE

4  MAT NUMBER, OR AT LEAST SOME IDEA OF WHO THESE PEOPLE ARE THAT

5  YOU COULD TELL THE COURT?

6       I MEAN IS HE ALLEGED TO HAVE RECRUITED 60, OR TWO, AND

7  IF IT'S TWO, DO YOU LIKELY REMEMBER WHO THEY ARE?

8  A.  I HESITATE TO SAY THE NUMBER BECAUSE I DON'T KNOW FOR SURE.

9  BUT BASED ON THE INVESTIGATION WE -- YOU KNOW, I COULD TELL

10 THAT HE WAS RECEIVING MONEY.  AND THEN HE WAS -- IT WAS BEING

11 DISBURSED TO SOME OF THE OTHER PEOPLE INVOLVED UNDER METRO IRPR

12 OR SELLING ON THE -- YOU KNOW, ON THAT UMBRELLA.

13 Q.  OKAY.  BUT SITTING HEAR TODAY YOU CAN'T GIVE THE COURT A

14 SENSE OF HOW MANY ARE TWO IS ALLEGED TO -- THAT HE IS ALLEGED

15 TO HAVE RECRUITED?

16 A.  I CAN'T PROVIDE AN EXACT NUMBER OR THE SPECIFIC NAMES.

17 Q.  OR AN APPROXIMATION EVEN.

18 A.  NO.

19 Q.  OKAY.  THE INDICTMENT DOESN'T STATE --

20       MR. FENTON:  (INAUDIBLE) THE FIRST TIME?

21       MS. BHARATHI:  I'M SORRY.

22       THE COURT:  WHEN WAS THE FIRST TIME YOU HAD CONTACT

23 WITH THE DEFENDANT?  HAS HE BEEN -- HAS HE LEARNED ABOUT THE

24 INVESTIGATION FOR SOME TIME OR DID YOU FIRST MAKE CONTACT WITH

25 HIM WHEN YOU ARRESTED HIM?

1           THE WITNESS:  WHEN WE ARRESTED HIM.

2           THE COURT:  AND WHEN IS THE FIRST TIME YOU LEARNED OF

3   ANY INVOLVEMENT BY HIM?

4           THE WITNESS:  THE INVESTIGATION HAS BEEN ONGOING FOR

5   ALMOST TWO YEARS.  SO WITHIN THE SUBPOENAS AND THE BANK RECORDS

6   THAT WE'VE LOOKED AT WITHIN THAT TIME PERIOD, SIR.

7   BY MS. BHARATHI:

8   Q.  OKAY.  AND THAT WOULD BE MY NEXT QUESTION ABOUT THE BANK

9   ACCOUNTS AND THE BANK RECORDS.

10          ON THE BANK RECORDS I BELIEVE THAT ARE REFERENCED IN

11  EITHER THE INDICTMENT OR THE PROFFER, MR. KADISH'S TRUE NAME

12  ARE ON THOSE BANK ACCOUNTS AND BANK RECORDS?

13  A.  IT SHOWS THAT THE ACCOUNT NAME IS UNDER NATIONAL IRPR OR

14  ENERGY FARMS AND IT SHOWS MR. KADISH AS ONE OF THE SIGNATORIES

15  IN THE SIGNATURE CARDS OF THE ACCOUNTS.

16  Q.  OKAY.  SO IT'S NOT -- IT'S HIS IDENTITY THAT'S THERE,

17  CORRECT?

18  A.  YOU HAVE TO ACCESS THE SIGNATURE CARDS TO KNOW THAT.  BUT,

19  YES.

20  Q.  OKAY.  THERE ARE JUST A COUPLE MORE QUESTIONS.

21          IN THE INDICTMENT AND IN THE GOVERNMENT'S PROFFER

22  THERE WAS REFERENCES TO JUST IN GENERAL FALSE STATEMENTS THAT

23  WERE ALLEGED THAT MR. KADISH WROTE.

24          MY UNDERSTANDING BASED ON THE PROFFER, AND CORRECT ME

25  IF I'M WRONG, IS THAT IRPR WAS LIKE THE MARKETING ARM FOR --

1    FOR THE UNDERLYING COMPANIES, IS THAT CORRECT?

2    A.  WELL, WHAT THEY DID IS THEY WOULD -- OR NATIONAL IRPR HE

3    WOULD TRY TO SELL THE EARTH WATER STOCKS THROUGH THE NAME

4    NATIONAL IRPR, YES.

5    Q.  OKAY.  AND SO IN TERMS OF THE FALSE STATEMENTS THAT THE

6    GOVERNMENT REFERENCED MY UNDERSTANDING IS THAT THE -- THAT THE

7    IRPR WAS EITHER PREPARING OR RESPONSIBLE FOR THE MARKETING

8    MATERIALS, IS THAT ACCURATE?

9    A.  YES.

10   Q.  OKAY.  AND SO KIND OF -- IN DOING THIS MARKETING WHAT

11   EVIDENCE DO YOU HAVE THAT THE SUBSTANCE OF THE MARKETING, THAT

12   IS THE INFORMATION CONTAINED IN WHATEVER PAMPHLETS, OR FLIERS,

13   OR THINGS LIKE THAT WAS CREATED BY MR. KADISH AS OPPOSED TO

14   RECEIVED BY MR. KADISH FROM THE CO-OWNERS?  DID THAT MAKE

15   SENSE?

16   A.  YES.  IN REVIEWING HIS EMAILS WE COULD SEE THAT HE WOULD

17   RECEIVE DRAFTS AND THEN HE WOULD GO AHEAD AND PUT SOME

18   INFORMATION IN THERE TO CHANGE THE DRAFTS TO WHERE HE FELT

19   COMFORTABLE WITH IT BEFORE IT WAS SENT OUT.

20   Q.  OKAY.

21           THE COURT:  HOW DO YOU KNOW THE INFORMATION HE WAS

22   RELAYING WAS FRAUDULENT?  IN OTHER WORDS, HOW DID HE KNOW THAT

23   IT WAS FRAUDULENT?

24           THE WITNESS:  BECAUSE OVER A PERIOD OF FIVE YEARS HE

25   WAS INVOICING -- THE AMOUNT IN THE INVOICE FOR NATIONAL IRPR HE

1  WOULD PUT THE AMOUNT OF STOCKS THAT WERE PURCHASED BY THE

2  VICTIMS AND HOW MUCH MONEY THAT WAS.  FOR EXAMPLE, THEY BOUGHT

3  X AMOUNT OF STOCK FOR $10,OOO AND THEN HE WOULD INVOICE THAT HE

4  WAS OWED $5,OOO.

5  BY MS. BHARATHI:

6  Q.  OKAY.  AND MY NEXT QUESTION TIES INTO THE MONEY.

7        THE BANK ACCOUNT FOR EARTH WATER, THE THREE OWNERS

8  WERE ON THAT BANK ACCOUNT, IS THAT ACCURATE?

9  A.  ON THE SIGNATURE CARDS I CAN'T REMEMBER THE EXACT NAMES

10  THAT WERE ON THERE.  I KNOW THAT MR. BARNS, THE CFO FOR EARTH

11  WATER WAS ON THERE FOR SURE.

12  Q.  OKAY.  BUT MR. KADISH DID NOT HAVE ACCESS TO EARTH WATER'S

13  ACCOUNTS, CORRECT?

14  A.  NO.  THAT'S WHY HE WOULD GO AHEAD AND INVOICE THE --

15  Q.  RIGHT.

16        (BOTH TALKING AT THE SAME TIME)

17  A.  -- NATIONAL IRPR INTERVIEW FORMS.

18  Q.  RIGHT.  OKAY.  THERE WAS MENTION THAT BY THE PROSECUTOR

19  REGARDING ELDERLY AND/OR VULNERABLE VICTIMS.  DID YOU HEAR

20  THAT?

21  A.  YES, MA'AM.

22  Q.  OKAY.  AND I JUST WANT TO CLARIFY.

23        WITH RESPECT TO ELDERLY VICTIMS WHAT EVIDENCE IS THERE

24  OR WHAT -- I THINK HE SAID APPROXIMATELY 250 VICTIMS.  WHAT

25  EVIDENCE IS THERE THAT ELDERLY WERE BEING TARGETED.

 1  A.  SURE.  I WILL SAY THAT WE DID NOT -- WE HAVE NOT LOOKED AT

 2  THE DATES OF BIRTH OF ALL 250 BUT WE DID DO A SAMPLING AND WE

 3  WERE ABLE TO IDENTIFY THAT BASED ON THE ENHANCEMENT RULES THAT

 4  MANY OF THE VICTIMS THAT WE IDENTIFIED, THEIR DATES OF BIRTH

 5  WOULD INDICATE THAT THEY WOULD QUALIFY AS ELDERLY.

 6  Q.  OKAY.  AND WHAT -- SO I HAVE A FEW QUESTIONS ABOUT THAT.

 7           SO WHAT IS THE AGE THAT YOU'RE LOOKING AT TO QUALIFY

 8  AS ELDERLY?

 9           THE COURT:  DOES IT MATTER AT ALL?

10           MS. BHARATHI:  IT DOES UNDER THE GUIDELINES FOR THE

11  ENHANCEMENT PURPOSES WHICH THE GOVERNMENT REFERENCED.

12           THE COURT:  OH.  I SEE.  NO QUESTION ABOUT THAT.

13           MS. BHARATHI:  OKAY.

14  BY MS. BHARATHI:

15  Q.  WHAT AGE WERE YOU USING -- BUT WHAT WAS THE SAMPLING SIZE

16  APPROXIMATELY TOO?

17  A.  THE SAMPLING SIZE I THINK WE LOOKED AT BETWEEN 20 AND 25

18  VICTIMS AND THE AGE I RELIED ON MR. FENTON TO LOOK AT THE

19  ENHANCEMENT LANGUAGE SO THAT HE COULD BE ABLE TO TELL US IF

20  THAT PERSON QUALIFIED OR DIDN'T QUALIFY AS ELDERLY.

21  Q.  OKAY.  SO YOU DON'T KNOW WHAT THAT WAS, THAT WAS SOMETHING

22  THAT THE PROSECUTOR DID, CORRECT?

23  A.  WELL, I MEAN, WE IDENTIFIED THAT MOST OF THE VICTIMS WERE

24  NOT IN THEIR 50S OR IN THEIR 40S.  THEY WERE IN THEIR 60S,

25  PERHAPS EVEN OLDER THAN THAT, AND THEN IT WAS INQUIRED AS TO

1   WHETHER OR NOT THAT QUALIFIED FOR THE ELDERLY ENHANCEMENT.

2   Q.  OKAY.  THANK YOU.

3          THE LAST QUESTION I HAVE WAS -- WELL, ONE MOMENT, YOUR

4   HONOR.  --

5   BY MS. BHARATHI:

6   Q.  DID YOU HAVE AN OPPORTUNITY TO CHECK WITH FINRA REGARDING

7   ANY -- ANY LICENSES THAT MR. KADISH MAY HAVE HELD IN THE PAST?

8   A.  I BELIEVE WE DID, YES.

9   Q.  I'M SORRY.  THAT HE DID HOLD LICENSES --

10  A.  NO.  NO.  I BELIEVE WE DID CHECK FINRA.

11  Q.  OKAY.  AND FINRA'S RESPONSE WAS --

12  A.  IT WAS A WORK CITE CHECK.  WE DID A SEARCH FOR HIS NAME.  I

13  DON'T THINK THAT HE CAME UP AS HAVING HELD A LICENSE, BUT --

14  Q.  CURRENTLY, RIGHT.  BUT IN THE PAST SHOWING ANY PRIOR

15  HOLDING OF LICENSES THAT HAVE EXPIRED, SUCH AS EITHER A SERIES

16  SIX, SEVEN, ANYTHING LIKE THAT THAT'S -- IF YOU KNOW.

17  A.  UNFORTUNATELY I DID THE SEARCH -- AS I MENTIONED THE

18  INVESTIGATION HAS BEEN GOING ON FOR TWO YEARS AND I DID THE

19  SEARCH EARLY ON IN THE INVESTIGATION ONCE WE IDENTIFIED

20  MR. KADISH AND I CAN'T SAY FOR SURE.

21  Q.  THAT'S --

22  A.  I DON'T RECALL.  I THINK IT WOULD STICK OUT IN MY MIND IF

23  ANY OF THEM WOULD HAVE HAD ANY KIND OF LICENSE THROUGH A FINRA

24  CHECK.

25  Q.  THAT'S FAIR ENOUGH.

1    THANK YOU, JUDGE.  THAT'S ALL I HAVE.

2    THE COURT:  OKAY.  YOU MAY STEP DOWN.

3    ALL RIGHT.  MISS BHARATHI, ANY ALTERNATIVE TO

4  DETENTION?

5    MS. BHARATHI:  YES, YOUR HONOR.

6    I'M ASKING THE COURT TO CONSIDER A PERSONAL SURETY

7  BOND THAT IS SECURED BY THE MOTHER'S CONDO.  THE MOTHER IS

8  HERE -- MRS. KADISH IS HERE.  SHE OWNS HER CONDO OUTRIGHT.  IT

9  WAS PURCHASED FOR $65,000 --

10    THE COURT:  WHEN WAS IT PURCHASED?

11    MS. BHARATHI:  IT WAS PURCHASED I THINK THREE TO FOUR

12  YEARS AGO.  TO BE CLEAR HIS MOTHER HAS A LIFE ESTATE IN THE

13  CONDO, BUT HIS TWO SISTERS WERE THE ONES WHO PURCHASED IT FOR

14  HER.

15    ONE OF THEM -- THE ONE THAT THE PROSECUTOR REFERENCED,

16  MELISSA, MELISSA LIVES IN NEW JERSEY.  I SPOKE WITH HER THIS

17  MORNING AND SHE WAS SPEAKING WITH THE FAMILY.

18    THE SISTER, MRS. ZIMMER, WHO IS IN THE BACK WITH THE

19  GLASSES, SHE IS THE OTHER PERSON WHO ASSISTED IN PURCHASING.

20  MISS ZIMMER WAS NOT MENTIONED BY THE GOVERNMENT AT ALL.

21    TO BE CLEAR WHEN I SPOKE WITH THE PROSECUTOR YESTERDAY

22  NEITHER THE MOTHER OR THE SISTER WHO WAS REFERENCED IN THE

23  PROFFER ARE CONSIDERED TARGETS OR UNINDICTED CO-CONSPIRATORS,

24  AND THERE IS NO ALLEGATION --

25    THE COURT:  BUT IN THE PROFFER IT WAS ONLY PURCHASED

1  RECENTLY, ISN'T THERE GOING TO BE A NEBBIA PROBLEM?

2      MS. BHARATHI:  I ASKED HIM IF THERE WAS ANY EVIDENCE

3  THE PROPERTY WAS PURCHASED WITH PROCEEDS AND HE SAID, NO.

4      SO THE MOTHER WHO IS IN COURT, SHE'S ELDERLY, YOU CAN

5  SEE SHE'S ON AN OXYGEN TANK IS HERE.  THE FAMILY IS WILLING TO

6  SECURE HIS RELEASE WITH THAT PROPERTY WHICH IS THE ROOF OVER

7  HER HEAD.  HE WOULD LIVE THERE.

8      TO BE CLEAR --

9      THE COURT:  AND SHE HAS A LIFE ESTATE?

10     MS. BHARATHI:  THEY KEEP REFERENCING IT AS THE

11  MOTHER'S HOME SO I JUST WANTED TO MAKE CLEAR THAT THE MOM'S

12  NAME IS NOT ON THE DEED.

13     THE COURT:  THE --

14     MS. BHARATHI:  THE TWO SISTERS.  MRS. ZIMMER STACEY,

15  AND MELISSA -- I'M SORRY.  JOHNSON, RIGHT?

16     JOHNSON.

17     AND I JUST WANT TO BE CLEAR, YOUR HONOR.  I THINK

18  THERE WAS SOME CONFUSION REGARDING THIS APARTMENT IN MIDTOWN.

19  HE WAS RENTING THIS APARTMENT.  MY UNDERSTANDING, I HAVE -- I

20  DON'T HAVE THE SAME ACCESS OR THE SAME DATABASES AS THE

21  GOVERNMENT AND LAW ENFORCEMENT OF COURSE BUT I DIDN'T FIND

22  ANYTHING THAT INDICATES THAT HE OWNED THAT APARTMENT.  MY

23  UNDERSTANDING WAS HE WAS LEASING IT, HE WAS RENTING IT, HE WAS

24  LIVING THERE.  I HAVEN'T FOUND ANYTHING THAT INDICATES

25  OTHERWISE.

```
 1            SO I DON'T THINK -- YOU KNOW, THE GOVERNMENT'S THREE
 2  MAJOR POINTS AS TO HIM BEING A RISK OF FLIGHT OR THAT HE HAD
 3  SOLD HIS HOME, I DON'T THINK THAT'S ACCURATE.  I KNOW HE WAS
 4  LIVING HERE, HE RELINQUISHED OR NO LONGER RENTING THAT
 5  APARTMENT.  THEY HAVE HIS PASSPORTS IN HIS NAME.
 6            THE COURT:  AND THE PROPERTY -- WHERE IS THE PROPERTY
 7  LOCATED THAT BELONGS TO THE SISTERS?
 8            MS. BHARATHI:  IT IS THE ONE REFERENCED IN THE
 9  PRETRIAL SERVICES REPORT IN DELRAY BEACH.
10            THE COURT:  ALL RIGHT.
11            MS. BHARATHI:  684 SAXSI (UNINTELLIGIBLE)
12            THE COURT:  I SEE.
13            MS. BHARATHI:  YOU KNOW --
14            THE COURT:  AND IT WAS PURCHASED THREE YEARS AGO FOR
15  65,000, IS THAT WHAT YOU SAID?
16            MS. BHARATHI:  THAT'S MY UNDERSTANDING.
17            THREE OR FOUR YEARS?
18            (INAUDIBLE)
19            MS. BHARATHI:  THEY BELIEVE IT'S BETWEEN THREE AND
20  FOUR YEARS.  THEY WEREN'T COMPLETELY SURE WHICH YEAR THEY
21  PURCHASED IT.
22            YOUR HONOR, IN TERMS OF -- WE TALKED A LITTLE BIT
23  ABOUT THE -- THE SENTENCING GUIDELINES A LITTLE BIT HERE TODAY.
24  OBVIOUSLY THERE ARE A LOT OF DIFFERENT ENHANCEMENTS THAT ARE IN
25  PLAY.  YOU KNOW, THESE ARE GUIDELINES, THEY ARE SUBJECT TO
```

1 | VARIANCES.

2 | WITH RESPECT TO HIS ROLE.  IF THE -- THERE IS ONE

3 | OWNER THAT THEY'RE SEEKING DETENTION ON.  TWO OTHER OWNERS HAVE

4 | RECEIVED AND BEEN RELEASED ON BOND.  THE OTHER PERSON WHO IS

5 | SIMILARLY SITUATED TO HIM, THE OTHER DAY WAS RELEASED ON BOND.

6 | MY UNDERSTANDING IS THAT THE PRIMARY REASON THAT THE

7 | GOVERNMENT IS MOVING FOR DETENTION AGAINST MR. KADISH IS THESE

8 | TIES TO BRAZIL.  HE HAS BEEN OPEN ABOUT HIS TRAVEL TO AND FROM.

9 | HE UNDERSTANDS THAT HE CANNOT LEAVE THE COUNTRY IF THE COURT

10 | IMPOSED A BOND.

11 | HIS GIRLFRIEND IS IN BRAZIL.  MY UNDERSTANDING IS SHE

12 | IS NOT PREGNANT.  I HAVE NOT PERSONALLY SPOKEN WITH HER, BUT IT

13 | IS HIS GIRLFRIEND WHETHER -- YOU KNOW, WHETHER IT WAS FIANCEE

14 | OR GIRLFRIEND IN THIS DISCUSSION IT'S NOT CLEAR TO ME THAT IT

15 | REALLY TRULY MATTERS WHEN THIS BOND WOULD BY SECURED BY THE

16 | ROOF OVER HIS MOTHER'S HEAD.

17 | SO I'M ASKING THE COURT TO CONSIDER A BOND SECURED BY

18 | THAT PROPERTY, IF THE COURT FELT NECESSARY CO-SIGNED BY A

19 | FAMILY MEMBER.  HE IS OBVIOUSLY IN A WHEELCHAIR, YOUR HONOR.  I

20 | DON'T KNOW IF THAT'S BEEN PLACED ON THE RECORD OR NOT.  THIS IS

21 | NOT SOMEONE WHO IS GETTING AROUND VERY QUICKLY OR VERY

22 | INCONSPICUOUSLY.

23 | THERE IS A FIREARM, A LAWFUL FIREARM IN HIS MOTHER'S

24 | HOME.  IF THE COURT WERE TO RELEASE HIM ON BOND, OF COURSE I

25 | WOULD HAVE THE FAMILY MAKE ARRANGEMENTS TO REMOVE THAT FIREARM

 1  FROM THE HOME.

 2       I WOULD ASK THE COURT TO ALSO CONSIDER A GPS ANKLE

 3  BRACELET.  THE MOM DOES NOT HAVE A LANDLINE AND MR. KADISH DOES

 4  NEED TO APPEAR IN TEXAS FOR COURT APPEARANCES.  SO I THINK THE

 5  GPS ANKLE MONITOR WOULD BE THE BEST MONITOR IN THIS SITUATION.

 6       IF THE COURT HAS SPECIFIC CONCERNS I WOULD BE HAPPY TO

 7  ADDRESS THEM.

 8       THE COURT:  IS THERE A MORTGAGE ON THE PROPERTY?

 9       MS. BHARATHI:  MY UNDERSTANDING IS THAT IT'S OWNED

10  OUTRIGHT, FREE AND CLEAR, NO MORTGAGE.

11       THE COURT:  OKAY.  THE GOVERNMENT'S POSITION ON

12  WHETHER OR NOT THE USE OF THE PROPERTY WERE COLLATERALIZED HIS

13  APPEARANCE WOULD BE A REASONABLE ALTERNATIVE.

14       MR. FENTON:  YOUR HONOR, THE GOVERNMENT BELIEVES IT

15  WOULD NOT BE REASONABLE.  ALL THE EVIDENCE INDICATES THAT

16  MR. KADISH IS STARTING A NEW LIFE WITH A NEW FAMILY IN A NEW

17  COUNTRY.  HE IS LEAVING THE COUNTRY.  HE HAS A TICKET.  HE JUST

18  GOT BACK FROM BRAZIL TWO DAYS AGO, WEDNESDAY.  HE HAS A TICKET

19  TO LEAVE ON SUNDAY.  HE IS GOING TO START A NEW LIFE IN BRAZIL.

20  THAT IS HIS PLAN.

21       SO HE HAS AN EXTREMELY STRONG INCENTIVE WHICH IS TO

22  JOIN HIS FIANCEE AND TO JOIN -- TO JOIN HIS FIANCEE WHO IS

23  PREGNANT, WHO IS GOING TO HAVE A CHILD.

24       EVEN IF YOU TAKE HIS PASSPORT THAT DOES NOT MEAN THAT

25  HE IS NOT GOING TO BE A SERIOUS RISK OF FLIGHT.

1           IN TERMS OF INCENTIVES THAT INCENTIVE IS PERHAPS ONE

2  OF THE STRONGEST INCENTIVES THAT I COULD THINK OF FOR SOMEONE

3  TO FLEE, TO BE WITH THEIR CHILD.  THE ONLY OTHER CHILD THAT

4  MR. KADISH HAS IS --

5           THE COURT:  WHAT IF I REQUIRE THE GIRLFRIEND TO BE

6  HERE AS A CONDITION?

7           MR. FENTON:  IT'S POSSIBLE I GUESS TO -- I DON'T KNOW

8  IF YOU COULD ACTUALLY COMPEL HER TO COME FROM BRAZIL OR IF

9  THERE ARE IMMIGRATION ISSUES.

10          MS. BHARATHI:  SHE DOESN'T HAVE -- I'M SORRY TO

11  INTERRUPT.

12          SHE DOESN'T HAVE A VISA.  I JUST WANT TO BE CLEAR

13  ABOUT THAT, THAT SHE DOES NOT HAVE A VISA TO COME TO THE UNITED

14  STATES IS MY UNDERSTANDING.

15          MR. FENTON:  THE OTHER ISSUE, YOUR HONOR, IS WE HAVE

16  NO IDEA WHAT PROCEED -- WHAT MONEY WAS USED TO PURCHASE THAT

17  HOME.  MR. KADISH IS INVOLVED IN SELLING SECURITIES FOR 25

18  YEARS.  THAT'S --

19          THE COURT:  ASSUMING -- LET'S ASSUME FOR THE SAKE OF

20  ARGUMENT THAT THE HOME COULD BE USED TO SATISFY A NEBBIA

21  REQUIREMENT.  LET'S ASSUME FOR THE SAKE OF ARGUMENT, BECAUSE

22  OBVIOUSLY IF IT CAN'T WELL THEN THAT'S A DIFFERENT ISSUE.

23  LET'S ASSUME FOR THE SAKE OF ARGUMENT THAT THE HOME -- YOU

24  COULD ESTABLISH A NEBBIA REQUIREMENT?

25          MR. FENTON:  YOUR HONOR, IT'S $65,000.  MR. KADISH

 1  RECEIVED 2.5 MILLION DOLLARS AS PART OF THIS FRAUD.  HE MAY

 2  HAVE MORE MONEY ABROAD.  WE HAVE NO IDEA BECAUSE THERE IS --

 3  THERE ARE PLENTY OF REASONS TO BELIEVE THAT HE'S INVOLVED IN

 4  OTHER SCHEMES AS WELL.  HE'S BEEN DOING THIS FOR AN EXTREMELY

 5  LONG AMOUNT OF TIME.

 6        NOTHING SUGGESTS THAT $65,000 MEANS ANYTHING TO THIS

 7  MAN OR TO HIS FAMILY.  AND THE FAMILY HAS ALSO BEEN INVOLVED IN

 8  THE FRAUD.  WHETHER KNOWING OR UNKNOWING THEY ARE NOT IN A

 9  POSITION TO REASONABLY ASSURE THAT HE IS GOING TO APPEAR IN

10  COURT FOR TRIAL WHEN HE IS FACING -- A SENTENCE OF UP TO 30

11  YEARS AND THEY'RE NOT IN A POSITION TO POLICE HIS CONDUCT.

12        THEY HAVE NOT POLICED HIS CONDUCTS TO DATE.  IN FACT,

13  THEY'VE PARTICIPATED THE CONDUCT.  AND I'M NOT SUGGESTING THAT

14  THEY'RE NECESSARILY CO-CONSPIRATORS, BUT THEY'RE PAYING PEOPLE

15  WHO ARE CO-CONSPIRATORS.  THEY ARE PAYING PEOPLE WITH VICTIM

16  PROCEEDS, VICTIM FUNDS AND THEY'RE WRITING THEMSELVES CHECKS

17  OUT OF THAT ACCOUNT FOR HUNDREDS AND THOUSANDS OF DOLLARS

18  BENEFITING FROM THAT.

19        THERE IS NO SECRET THAT MR. KADISH DOESN'T HAVE A

20  COLLEGE DEGREE, THAT HE DOESN'T HAVE THESE LICENSES.  INSPECTOR

21  BODON, THEY HAVE LOOKED AT THE FINRA WEBSITE AND NOT RECALL

22  EXACTLY WHETHER OR NOT MR. KADISH HAD LICENSES.

23        I PERSONALLY HAVE LOOKED AT THAT WEBSITE ON MULTIPLE

24  OCCASIONS AND HE DOES NOT HAVE ANY PROFESSIONAL LICENSES.  HE

25  NEVER WORKED AS FAR AS WE'RE AWARE FOR A LEGITIMATE FINANCIAL

1  INSTITUTION.  HE NEVER WORKED FOR A BROKER, DEALER.

2        THESE STOCK SALES, WHAT HE'S DOING IS ENGAGING IN

3  TELEMARKETING FRAUDS BASICALLY WHERE HE'S SELLING UNREGISTERED

4  SECURITIES ON THE TELEPHONE WITH THIS GROUP OF INDIVIDUALS.

5  WHAT IS REFERRED TO IN THE BUSINESS IS RUNNING A ROOM.

6  BASICALLY HE GETS A BUNCH OF PEOPLE THAT ALL SELL THE SECURITY

7  TO GET A 50 PERCENT CUT OF THE SECURITY AND THEN THEY SHARE IN

8  THE PROCEEDS.

9        THE IMPORTANT THING I THINK TO ALSO UNDERSTAND IS THAT

10  THE EVIDENCE IN THIS CASE IS OVERWHELMING.  IT'S VERY CLEAN CUT

11  BECAUSE THE REPRESENTATION THAT'S BEING MADE IN ALL OF THE

12  PROMOTIONAL MATERIALS AND INVESTOR PRESENTATIONS THAT ARE BEING

13  CIRCULATED ARE CLEAR AND UNAMBIGUOUS, THEY'RE UNMISTAKABLE.

14  NINETY PERCENT OF THE MONEY WILL BE REINVESTED IN THE COMPANY,

15  90 PERCENT.

16        SOME OF THOSE MATERIALS ARE QUITE VOLUMINOUS, 50, 60,

17  70 PAGES IN LENGTH.  SOME OF THEM ARE ONE PAGE IN LENGTH.  THEY

18  CONTAIN CHARTS THAT POINT DOWN HOW THE MONEY IS GOING TO BE

19  SPENT, USE OF PROCEEDS CHARTS.  THAT'S ONE PAGE THERE SAYS

20  RIGHT THERE, 90 PERCENT IS GOING TO GO TO THE COMPANY, AT MOST

21  10 PERCENT WILL BE IN COMMISSION.

22        MR. KADISH KNEW THAT THAT WAS A LIE.  HE KNEW IT WAS A

23  LIE BECAUSE HE WAS SENDING OUT INVOICES EVERY WEEK, EVERY MONTH

24  FOR 50 PERCENT OF EACH VICTIM'S MONEY.  AND THIS WENT ON NOT

25  FOR A COUPLE OF MONTHS OR A YEAR.  THIS WENT ON FOR FIVE YEARS.

1  IT WAS GOING ON UNTIL THIS DAY, AND UNTIL WE ARRESTED ALL THESE

2  PEOPLE IT WOULD HAVE CONTINUED TO GO ON.

3      SO THAT LIE THAT THE COMPANY -- THAT THE MONEY IS

4  ACTUALLY GOING TO THE COMPANY WAS TOLD FOR FIVE YEARS AND

5  MR. KADISH HAS RECEIVED 50 PERCENT OF EACH VICTIMS MONEY FOR

6  ALL OF THOSE FIVE YEARS.  HE'S BASICALLY RAISED FIVE MILLION

7  DOLLARS FROM INVESTORS AND RECEIVED TWO AND A HALF MILLION

8  IN -- IN COMMISSIONS.

9      THAT IS NOT A HARD CASE TO PROVE.  WE HAVE THE EMAIL

10  THAT WERE OBTAINED BY SEARCH WARRANT FROM HIS EMAIL ACCOUNTS.

11  WE HAVE THE BANK RECORD -- WE HAVE THE INVOICES THAT HE SENT,

12  THAT HE SUBMITTED FOR ALL THE VICTIMS.  WE HAVE (INAUDIBLE)

13  THAT SHOW THAT HE RECEIVED PAYMENT.  TO ESTABLISH KNOWLEDGE IN

14  A CASE LIKE THAT IS SIMPLE AND IT'S VERY STRAIGHT FORWARD.  SO

15  THIS IS NOT A HARD CASE.

16      MS. BHARATHI:  YOUR HONOR, IF I MAY.

17      WITH REGARD TO ANY CONCERNS ABOUT THE HOME AND THE

18  PURCHASE.  I THINK AS THE COURT POINTED OUT A NEBBIA WOULD BE

19  THE WAY GET AT THE HEART WHETHER THAT MONEY IS PROCEEDS OR NOT.

20      IF IT IS -- I WOULD BE SURPRISED THE GOVERNMENT WOULD

21  NOT HAVE TOLD ME THAT, BUT I CAN CERTAINLY GET WITH THE FAMILY

22  AND PREPARE NEBBIA DOCUMENTS.

23      YOU KNOW, WITH RESPECT TO 2.5 MILLION, THERE HAS BEEN

24  NO TESTIMONY TODAY ABOUT WHERE THAT MONEY MAY BE OR IS -- YOU

25  KNOW, WHERE THAT MONEY MAY BE.

```
 1            I WOULD POINT OUT THAT THE AGENT VERY FRANKLY
 2  TESTIFIED THAT THE EVIDENCE THAT HE HAS SEEN -- I'M SORRY,
 3  INSPECTOR, THE EVIDENCE THAT HE HAS SEEN INDICATES THAT THE
 4  CO-OWNERS PROVIDED DRAFTS TO MR. KADISH AND OTHERS.  AND, YOU
 5  KNOW, AS PART OF MARKETING MR. KADISH MAYBE TWEET WORDS HERE OR
 6  THERE --
 7            THE COURT:  JUST MOVING FORWARD.
 8            GIVEN THAT HE HAS NO TIES TO THE NORTHERN DISTRICT OF
 9  TEXAS, DOES HE?
10            MS. BHARATHI:  HE DOES NOT HAVE TIES THAT I'M AWARE OF
11  TO THE NORTHERN DISTRICT.  HIS TIES ARE HERE WHICH IS WHY WE
12  CHOOSE TO HAVE THE BOND HEARING HERE, TO HAVE HIS MOTHER AND
13  HIS SISTER PRESENT IF THE COURT WANTED TO ASK THEM ANY
14  QUESTIONS.  BUT THIS IS WHERE HE WOULD STAY.  HE WOULD LIVE AT
15  HIS MOTHER'S APARTMENT THAT'S LISTED HERE, THAT'S PAID FOR AND
16  WOULD BE USED TO SECURE THE BOND.
17            THE COURT:  OKAY.
18            DOESN'T THE GOVERNMENT HAVE ABOUT (INAUDIBLE) IF ALL
19  THAT YOU HAVE HERE WAS THE $65,000 CONDO THAT SOME OF THE
20  FAMILY MEMBERS MAY HAVE EITHER WITH KNOWLEDGE OR WITHOUT
21  KNOWLEDGE HAD BENEFITED FROM FUNDS THAT WERE INVOLVED IN THE
22  FRAUDULENT SCHEME.  SO THERE IS A CHANCE THAT THE NEBBIA MAY
23  NOT BE SATISFIED ON THAT.  BUT EVEN ASSUMING IT WAS, IS IT
24  SUFFICIENT GIVEN THE NATURE OF THE FRAUD?
25            MS. BHARATHI:  YOUR HONOR, I THINK SO.  I MEAN, WE --
```

1  IN THIS DISTRICT WE SEE CASES WITH MUCH LARGER FRAUD FIGURES

2  WHERE INDIVIDUALS DO GET BOND.

3          I DO THINK IT'S --

4          THE COURT:  WAIT A MINUTE.

5          BUT I DON'T -- I CAN'T IMAGINE -- I JUST DON'T

6  THINK -- I JUST DON'T THINK I HAVE RELEASED SOMEBODY ON A

7  MULTI-MILLION DOLLAR FRAUD FOR LESS THAN A CORPORATE SURETY

8  BOND OF SOME SUBSTANTIAL AMOUNT.  AT LEAST I CAN'T REMEMBER.

9          MS. BHARATHI:  AND, YOUR HONOR, I THINK -- YOU KNOW,

10  IN THESE SORT OF LIKE RENTING A ROOM CASES, YOU KNOW, PEOPLE

11  DON'T GENERALLY HAVE ACCESS TO LARGE QUANTITIES OF FUNDS.

12  THAT'S WHY HE HAS A PUBLIC DEFENDER.

13          BUT, YOUR HONOR, IN THIS PARTICULAR INSTANCE I THINK

14  THE NEBBIA WOULD BE THE WAY TO SECURE THE COURT -- OR, YOU

15  KNOW, ASSURE THE COURT REGARDING ANY OF PROCEEDS THAT THE

16  GOVERNMENT HAS ALLEGED WERE INVOLVED.

17          YOU KNOW, I SPECIFICALLY SPOKE WITH THE GOVERNMENT

18  YESTERDAY.  I ASKED, IS THE FAMILY A TARGET?  ARE THEY

19  CONSIDERED UNINDICTED CO-CONSPIRATORS?  BECAUSE HONESTLY I'M

20  SPEAKING WITH THEM ABOUT THINGS THAT RELATE TO THE CASE AND I

21  WANT TO KNOW IF THAT'S SOMETHING I SHOULD BE DOING OR NOT.

22          IT IS SOMETHING I'M DOING.  THE FAMILY IS HERE, THEY

23  ARE IN COURT, THEY STAND BY HIM.  YOUR HONOR SEES THE PHYSICAL

24  CONDITION HE IS IN.

25          HE'S GOING TO HAVE TO TRAVEL TO AND FROM THE NORTHERN

1  DISTRICT.  HE SIMPLY WANTS TO BE AT HOME WITH HIS FAMILY.  WE

2  LOOKED AT THE PRETRIAL SERVICES REPORT WHICH RECOMMENDS A BOND

3  AS WELL, AND THE OTHER INDIVIDUALS IN THIS CASE MINUS THE FIRST

4  CODEFENDANT HAVE ALL RECEIVED BOND.

5        SO THERE IS AT LEAST TWO INDIVIDUALS WHO ARE THE

6  OWNERS WHO ARE, YOU KNOW, ARGUABLY MUCH MORE CULPABLE THAN HE

7  IS.  HE DID NOT HAVE ACCESS TO EARTH WATER'S BANK ACCOUNTS.  SO

8  THE GOVERNMENT IS MAKING A POINT REGARDING THE INVOICING.

9        I OBVIOUSLY HAVEN'T SEEN THE EVIDENCE.  BUT IF HE'S

10  TURNING INVESTORS MONIES OVER TO THE OWNERS WHO ARE THEN

11  DEPOSITING THOSE MONIES, AND THEN INVOICING THEM, THAT DOESN'T

12  INDICATE THAT HE IS KEEPING HALF THOSE INVESTORS MONEY.

13        THEY MAY HAVE AN AGREEMENT.  WE JUST DON'T KNOW WHAT

14  THE AGREEMENT WAS BETWEEN MARKETING AND THE OWNERS OF THE

15  COMPANY, OR IN HIS INVOICING AND WHAT HE COULD ASK FOR.

16        SO I UNDERSTAND THE GOVERNMENT'S POINT AND THEY

17  BELIEVE THAT HE EARNED 2.5 MILLION DOLLARS, BUT I DON'T THINK

18  AT THIS POINT IT'S AS CLEAR CUT AS TO WHAT HIS ROLE WAS OTHER

19  THAN MARKETING IF THAT'S ACCURATE.

20        SO I DO THINK IN THIS PARTICULAR CASE IT'S NOT LIKE A

21  TYPICAL PONZI SCHEME OR SEC FRAUD THAT WE GET.  THIS IS A

22  SITUATION WHERE SOMEBODY IS INVOLVED IN MARKETING AS THE

23  INSPECTOR TESTIFIED.

24        HE HAS TWO FAMILY MEMBERS IN THE COURT WHO ARE WILLING

25  TO SECURE THIS BOND WITH THE ROOF THAT'S CURRENTLY OVER THEIR

 1   MOTHER'S HEAD.  I THINK THE FAMILY'S FAITH AND TRUST IN HIM IS

 2   THE MOST TELLING THING HERE.

 3        MR. FENTON:  YOUR HONOR, I JUST -- I WOULD LIKE TO

 4   ADDRESS THE ALLEGATIONS IN THE INDICTMENT IN THIS --

 5        THE COURT:  I THINK IT'S A BONDABLE CASE BUT I DO

 6   THINK THE GOVERNMENT'S CONCERNS WITH THE RISK OF FLIGHT IS

 7   LEGITIMATE.

 8        APART FROM THE BRAZILIAN CONNECTION, THE AMOUNT OF

 9   FRAUD AT ISSUE THAT MAY HAVE BEEN POCKETED, THE FACT THAT HE

10   HAS NO TIES TO THE NORTHERN DISTRICT OF TEXAS WHICH IS WHERE

11   THE CASE IS BASED.  SO I HAVE TO -- SO I HAVE TO GIVE THAT

12   CONSIDERATION.

13        SO ORDINARILY I WOULD GIVE -- IN A SITUATION LIKE THIS

14   I WOULD GIVE A BOND OF -- THAT WOULD BE A MUCH MORE SUBSTANTIAL

15   BOND.  BUT IT'S POSSIBLE THAT THERE MAY BE OR NOT NEBBIA PROOF

16   EITHER FOR THE FAMILY OR FRIENDS THAT -- THAT -- YOU KNOW, THAT

17   YOU DON'T KNOW ABOUT THAT THERE MAY BE AN ALTERNATIVE TO

18   SATISFY.

19        BUT I THINK IN A SITUATION LIKE THIS, WE HAVE A 2.5

20   MILLION DOLLAR FRAUD.  NORMALLY I TRY TO DO 10 PERCENT.  SO IT

21   WOULD BE LIKE 10 PERCENT -- YOU KNOW, A $250,000 CORPORATE

22   SURETY.

23        I GUESS I COULD MODIFY THAT A BIT BUT IT HAS TO BE A

24   HUNDRED THOUSAND CORPORATE SURETY, OBVIOUSLY INCLUDING ANY REAL

25   PROPERTY TO SUSTAIN IT.  BUT IF HE CAN COME UP WITH SOMETHING

1   LIKE THAT I THINK THAT THAT ADEQUATELY ELIMINATES THE RISK OF

2   FLIGHT.  NOW HE MAY NOT BE ABLE TO BUT I WANT TO GIVE HIM AN

3   OPPORTUNITY TO SEE IF HE CAN COME UP WITH IT.

4            SHORT OF THAT I THINK THE GOVERNMENT'S CONCERN OF RISK

5   OF FLIGHT IS SUFFICIENT THAT I JUST DIDN'T THINK THAT A $65,000

6   OR A HUNDRED THOUSAND DOLLAR PERSONAL SURETY BOND, WHICH IS OF

7   NO REAL VALUE AT THIS POINT OTHER THAN THE CONDOMINIUM, I DON'T

8   KNOW THAT THAT'S SUFFICIENT.

9            I WOULD NORMALLY GIVE YOU A BOND GIVEN THAT I THINK IN

10  PRIOR CASES LIKE THIS I HAVE GIVEN BONDS OF SOME SUBSTANTIAL

11  AMOUNT AND (INAUDIBLE) HE IS NOT A BRAZILIAN CITIZEN.  SO THERE

12  IS NO -- YOU KNOW, THAT HE COULD BE EXTRADITED FROM BRAZIL.

13  BUT I THINK HOUSE ARREST PLUS A HUNDRED THOUSAND DOLLAR

14  CORPORATE SURETY BOND WOULD BE SUFFICIENT.

15           I DON'T KNOW IF HE COULD MAKE IT SO -- BUT I AM GOING

16  TO SET THAT BOND.  THE CONDITIONS SET FORTH IN THE PRETRIAL

17  SERVICES REPORT WOULD ALL BE ADOPTED.

18           THE PRIMARY CONDITION BEING HOUSE ARREST EXCEPT FOR

19  APPEARANCES IN COURT IN THE NORTHERN DISTRICT OF TEXAS AND

20  MEDICAL NEEDS GIVEN HIS CONDITION.

21           SO I WILL SET THAT BOND.  I DON'T KNOW IF HE CAN MAKE

22  IT BUT AT LEAST HE WILL HAVE AN OPPORTUNITY TO TRY.  OKAY?

23           SO I DENY THE GOVERNMENT'S MOTION FOR DETENTION

24  WITHOUT PREJUDICE BECAUSE IF HE CAN'T MAKE THE BOND THEN I'LL

25  CONVERT TO DETENTION, OR YOU CAN LET ME KNOW IN THAT PERIOD OF

1   TIME.  THERE IS SUFFICIENT BASIS TO DETAIN AS A SERIOUS OF

2   FLIGHT.  SO I'M WILLING TO DENY IT IN LIEU OF THE CORPORATE

3   SURETY BOND OF THAT AMOUNT.

4           MS. BHARATHI:  UNDERSTOOD.  I'LL SPEAK WITH THE

5   FAMILY --

6           THE COURT:  AND THAT ASSUMES, OF COURSE, THE PROPERTY

7   CAN SATISFY A NEBBIA.  BUT I'M --

8           MS. BHARATHI:  UNDERSTOOD.

9           THE COURT:  OKAY?

10          NOW, AS TO THE REMOVAL ISSUE?

11          MS. BHARATHI:  YOUR HONOR, THE GOVERNMENT HASN'T

12  PROFFERED ANY EVIDENCE --

13          THE COURT:  FRANKLY I DIDN'T -- I WILL LET HIM GO

14  AHEAD AND DO THAT.

15          MR. FENTON:  YES, YOUR HONOR.

16          I DON'T THINK THAT THERE IS ANY DISPUTE THAT

17  MR. KADISH IS THE CORRECT PERSON.

18          MR. KADISH --

19          THE COURT:  WELL, GO AHEAD AND PUT ON -- PROFFER TO ME

20  THE EVIDENCE THAT YOU WOULD USE --

21          MR. FENTON:  I CAN CERTAINLY DO THAT.

22          THIS IS A CASE WHERE THE GOVERNMENT FOLLOWS THE MONEY.

23  WE FOLLOWS EARTH WATER'S PAYMENTS TO THE VARIOUS SALESPEOPLE

24  THAT LED US TO THE BANK ACCOUNTS FOR NATIONAL IRPR AND FOR

25  ENERGY FARMS AS WELL.

1          ONCE WE SUBPOENAED THOSE BANK RECORDS IT INDICATED

2  THAT MR. KADISH WAS ONE OF THE CO-SIGNERS.  HE GAVE HIS NAME,

3  HIS ADDRESS, HIS SOCIAL SECURITY NUMBER, HIS DATE OF BIRTH.

4          WE THEN USED THAT NUMBER TO IDENTIFY -- TO IDENTIFY

5  HIM AND TO TRY TO LOCATE HIM.  WE EVENTUALLY ARRESTED HIM.

6  WHEN HE WAS -- WE SEIZED HIS ASSETS IN THE MEANTIME.

7          WHEN WE SEIZED HIS ASSETS WE TOOK MONEY OUT OF THE

8  NATIONAL IRPR BANK ACCOUNT THAT HE WAS USING.  WHEN HE WAS

9  APPREHENDED ONE OF THE THINGS THAT HE SAID TO THE INSPECTOR WAS

10  THAT HE WAS COMPLAINING ABOUT THE FACT THAT HIS ASSETS HAD BEEN

11  SEIZED OUT OF THE BANK ACCOUNT, AND HE ALSO SAID THAT HE WORKED

12  FOR NATIONAL IRPR AND THAT HE WAS SELF-EMPLOYED AND THAT WAS

13  HIS COMPANY.

14          SO BASED ON THOSE FACTS AND THE FACT THAT ALL THE

15  PERSONALLY -- PERSONAL IDENTIFYING INFORMATION MATCHED WE

16  BELIEVE THAT MR. KADISH -- MR. RICHARD LAWRENCE KADISH IS THE

17  CORRECT PERSON WHO HAS BEEN INDICTED.

18          THE COURT:  ANY QUESTIONS OF THE AGENT?

19          MS. BHARATHI:  NO, YOUR HONOR.

20          THE COURT:  ALL RIGHT.

21          THE COURT FINDS THAT THE -- FOR IDENTITY PURPOSES THE

22  GOVERNMENT HAS SATISFIED ITS BURDEN OF SHOWING THAT MR. KADISH

23  IS THE INDIVIDUAL WHO HAS BEEN CHARGED IN THE NORTHERN DISTRICT

24  OF TEXAS.

25          SO I WILL -- I ALREADY TOOK CARE OF THE BOND ISSUE,

```
 1  AND LET'S SEE IF HE CAN MAKE IT OR NOT.  OBVIOUSLY YOU'LL HAVE
 2  AN OPPORTUNITY TO REVIEW THAT ISSUE AT A NEBBIA HEARING IF GET
 3  THAT FAR.
 4            OKAY?
 5            MS. BHARATHI:  THANK YOU, JUDGE.
 6            MR. FENTON:  THANK YOU, YOUR HONOR.
 7            THE COURT:  ALL RIGHT.  THANK YOU.
 8            THE CLERK:  ALL RISE.
 9                             - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1
 2
 3                     C E R T I F I C A T E
 4
 5
 6  UNITED STATES OF AMERICA
 7  SOUTHERN DISTRICT OF FLORIDA
 8
 9
10        I, CARL SCHANZLEH, OFFICIAL COURT REPORTER OF THE UNITED
11  STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA, DO
12  HEREBY CERTIFY THAT THE FOREGOING 42 PAGES CONSTITUTE A TRUE
13  TRANSCRIPT OF THE PROCEEDINGS HAD BEFORE THE SAID COURT HELD IN
14  THE CITY OF MIAMI, FLORIDA, IN THE MATTER THEREIN STATED.
15        IN TESTIMONY WHEREOF, I HEREUNTO SET MY HAND ON THIS
16  11TH DAY OF JANUARY 2020.
17
18                              /S/CARL SCHANZLEH
                                CARL SCHANZLEH, RPR-CM
19                              CERTIFIED COURT REPORTER
                                9960 SW 4TH STREET
20                              PLANTATION, FL 33324
                                TELEPHONE 954 424-6723
21
22
23
24
25
```